IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARK PATRICK, | § | |
| | § | |
|    Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| THE DUGABOY INVESTMENT | § | |
| TRUST, | § | |
| | § | |
|    Defendant. | § | |

## ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Mark Patrick ("Patrick") files this Original Complaint for Declaratory Judgment pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201 and respectfully shows as follows:

### SUMMARY OF COMPLAINT

1.    Patrick is a non-signatory to the arbitration agreements under which Dugaboy—a trust for the benefit of notorious serial litigant James Dondero—sues Patrick for over $100 million. The arbitration is the latest salvo in Dondero's scorched-earth tactics to take control of, and use for his own purposes, a legal structure referred to as the "Charitable DAF."

2.    Arbitration is a creature of contact, and arbitrability of claims against non-signatories like Patrick are questions for this Court, not the arbitrators. Under Texas law, the default rule is a non-signatory like Patrick cannot be forced to arbitrate absent a recognized exception, none of which apply here. Patrick did not agree to arbitrate this dispute and thus seeks a declaration from this Court that he

is not bound by the arbitration agreement and cannot be forced to arbitrate any claims under those agreements.

PARTIES, JURISDICTION, AND VENUE

3.      Plaintiff Mark Patrick is an individual residing in Texas who is a citizen of Texas for the purposes of diversity jurisdiction.

4.      The Dugaboy Investment Trust ("Dugaboy") is a Delaware perpetual nonrevocable trust with its principal place of business in Dallas County, Texas. Nancy Dondero is an individual and a Florida citizen. Nancy Dondero, as trustee, and in turn Dugaboy, is thus a Florida citizen for diversity purposes. Nancy Dondero, as trustee, may be served with process at 1510 Coral Oak Ln. # 1305, Vero Beach, FL 32963, or wherever she may be found.

5.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 2201 because complete diversity exists between the parties, the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs, and Patrick seeks declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district.

FACTUAL BACKGROUND

**A.      James Dondero and his Highland empire rise and fall.**

7.      For the last 30 years, James Dondero has been on the forefront of structured finance and asset management, including the creation and management

of collateralized loan obligations ("CLOs") under the umbrella of Highland Capital

Management, LP ("Highland"), together with an eye-popping number of subsidiaries.

Nancy Dondero is Dondero's sister.[1]

8.      Dondero and Highland were very successful, for a time. Prior to the

financial crisis of 2007 and 2008, Dondero and Highland managed assets valued in

excess of $40 billion. Even today, Dondero's companies tout at least $17 billion in

assets under management.

9.      But Dondero's proclivity to engage in wide-ranging and expensive

litigation largely contributed to the demise of Highland, which is still in the

bankruptcy liquidation process before Judge Stacey Jernigan, Case No. 19-34054-

sgj11, in the Northern District of Texas, Dallas Division. Another company formed by

Dondero, Acis Capital Management, LP ("Acis"), suffered a similar fate in federal

bankruptcy court.

10.     Despite these many failures, Dondero continues in finance and banking

through his entities that operate under the "NexPoint" banner. And Dondero

continues to litigate extensively—a tiger does not change its stripes.

**B.      The Charitable DAF—legally-distinct and independent entities with a common purpose: charitable giving.**

11.     In or around 2011, the Charitable DAF was founded and seeded with,

among other things, CLO assets that were rolled over following the expiration of prior

charitable trusts created by Dondero. The Charitable DAF is a legal structure made

---

[1] James Dondero is referred to herein as "Dondero," and any instance when Patrick refers to Nancy Dondero, Patrick refers to Nancy Dondero in her capacity as trustee of Dugaboy.

up of various entities (colloquially referred to collectively as the Charitable DAF),

which is supposed to be operated solely to the ultimate benefit of worthy charitable

causes.

12.     The Internal Revenue Code encourages charitable giving, of course.

Charitable donations generally receive favorable tax treatment, and non-profits are

not taxed in the same fashion as for-profit enterprises.

13.     The Charitable DAF is a for-profit entity with a charitable mission. As

a legal structure set up to benefit charities, the Charitable DAF receives favorable

tax treatment. In order to receive that treatment, though, the Charitable DAF must

operate independently of their donors. Stated another way, the Charitable DAF is not

Dondero's and its function is not to benefit Dondero.

14.     In 2021, Mark Patrick received ownership of the management shares of

the Charitable DAF, and as such is its control person. In addition to Mr. Patrick, the

Charitable DAF has a Cayman-based outside director, Paul Murphy, who provides

completely independent, objective oversight of the Charitable DAF. Before Mr.

Patrick had ownership of the management shares, the Charitable DAF had no outside

directors.

15.     Since 2021 when Mr. Patrick gained ownership of the management

shares, the Charitable DAF's independence is indisputable—it employs its own

attorneys, financial advisors, and other professionals. And the decisions made by Mr.

Patrick and Paul Murphy are for the best interests of the Charitable DAF, and no one

else. While the Charitable DAF owns some assets that are associated with Dondero

and his companies, the Charitable DAF—acting through Mr. Patrick and Mr. Murphy—stands alone and independent.

**C.    Dondero increasingly attempts to assert control over the Charitable DAF, including making audacious requests from Mr. Patrick for Charitable DAF assets.**

16.    Mr. Patrick and Mr. Murphy fortified the boundaries between the Charitable DAF and Dondero, including:

- Engaging new legal counsel to advise the Charitable DAF on both transactional and litigation matters;

- Engaging new financial advisors to advise the Charitable DAF on investment and finances matters;

- Terminating the Charitable DAF's relationship with Skyview, an entity controlled by Dondero who employs many of Highland's former in-house lawyers;

- Pursuing, through litigation and otherwise, recovery of assets of the Charitable DAF, regardless of their relationship with Dondero;[2] and

- Refusing to enter into transactions with Dondero and his affiliates when doing so was not in the Charitable DAF's best interests.

17.    Dondero does not like any of this independence. Additionally, Dondero and his longtime partner and legal fixer Scott Ellington find themselves in increasingly perilous legal and financial situations. For example, UBS is prosecuting

---

[2] *See e.g.* Cause No. 25-BC01B-0004; *Atlas IDF, LP v. NextPoint Real Estate Partners, LLC*; In the Business Court of Texas, 1st Division; Case No. 3:25-CV-00477-L; *Liberty CLO Holdco, Ltd. v. Highland Capital Management Services, Inc.*; In the United States District Court for the Northern District of Texas, Dallas Division

a special proceeding in New York against Dondero and Ellington, individually, for in excess of $1 *billion*.[3] Dondero has repeatedly sought to exert influence over and benefit from the Charitable DAF, and each time Mr. Patrick has rebuffed him.

18.    For example, in November 2023, Dondero asked Mr. Patrick to make an offshore wire transfer from the Charitable DAF of approximately $1,500,000 to Sentinel Reinsurance, Ltd. (a Dondero-owned entity),which Dondero claimed was for payment of legal fees unrelated to the Charitable DAF or its charitable purposes. That transfer was part of a larger set of offshore wire transfers of approximately $7 million for unknown purposes, all orchestrated by Dondero and Ellington.

19.    This request of Mr. Patrick by Dondero would have taken money from Charitable DAF and its charitable beneficiaries and put it into Dondero's pockets in offshore accounts. Mr. Patrick, acting for the Charitable DAF and not Dondero—as he aways has—refused Dondero's request.[4]

**D.    Dondero tries to buy off Mr. Patrick through the Ashcroft Firm.**

20.    Dondero has also tried to bribe Mr. Patrick into stepping aside from his stewardship of the Charitable DAF, for Dondero's ultimate goal of controlling and using the Charitable DAF's assets at an increasingly financially perilous time in Dondero's life.

21.    To that end, Dondero hired the Ashcroft Firm, who in turn contacted counsel for the Charitable DAF. Among other things, Dondero offered "significant

---

[3] *See* Index. No. 650744/2023; *UBS Securities LLC et al v. Dondero et al*; In the Supreme Court of the State of New York, New York County

[4] Mr. Patrick has independent, contemporaneous evidence to demonstrate the bona fides of issues related to this audacious request by Dondero.

monetary compensation" and "full releases" if Mr. Patrick stepped aside so that Dondero could gain access and control of the Charitable DAF—his ultimate goal.

**E.    Dondero and those he controls (with his money) attempt to gain control of the Charitable DAF's assets through a Cayman action.**

22.    As outlined above, the Charitable DAF has been pursuing collection on its assets, regardless of whether that affects Dondero, e.g. when a Dondero entity owes the Charitable DAF money or property, the Charitable DAF will pursue that money or property in the best interests of the Charitable DAF. Because, of course, the identity of the counterparty to the transaction is not the relevant inquiry—it's what's in the best interests of the Charitable DAF, not Dondero.

23.    On February 20, 2025, Atlas, an entity for which the Charitable DAF acts, served Dondero's company NexPoint Real Estate Partners, LLC ("NexPoint RE") with a lawsuit to collect on a ~$13M debt related to two promissory notes (the "Atlas Notes Case").[5] A few weeks later, Dondero's sister was served with process in the Atlas Notes Case, as trustee of Dondero's trust, Dugaboy.

24.    On March 25, 2025, the Charitable DAF subsidiary moved for summary judgment in the Atlas Notes Case. After all, Dondero's NexPoint RE had not paid the notes—there is no fact question on that issue.

25.    On April 23, 2025, less than a month later, Dondero retaliated in the Cayman Islands. There, he directed the filing of an action against the Charitable DAF with the unmistakable goal of attempting to gain control over it and stymieing the Charitable DAF's efforts to act in the Charitable DAF's best interests, not Dondero's,

---

[5] *See* fn. 2.

in pursuing collection of Charitable DAF assets, even if they are ultimately from Dondero.

26.     The goal is for Dondero to control the Charitable DAF and its assets so Dondero—who is in increasingly dire financial straits—can use them for his personal benefit. And Dondero wants to kill the Atlas Notes Case and other litigation the Charitable DAF is pursuing to collect debts owed to the Charitable DAF by entities Dondero controls. Dondero has a long history of attempting to avoid debts to related parties, as the Fifth Circuit recently described in detail in affirming judgments against him. *Matter of Highland Capital Mgmt., L.P.*, 116 F.4th 422, 428 (5th Cir. 2024) ("Dondero was effectively on both sides of these promissory notes, acting on behalf of High-land and the relevant subsidiaries.").

**F.      The Arbitration.**

27.     The Arbitration involves years-old transactions—some nearly 10 years old.

28.     On or about December 24, 2015, Hunter Mountain Investment Trust ("Hunter Mountain") executed a Secured Promissory Note (the "Note") in favor of Dugaboy—another trust controlled by Dondero—in the principal amount of $62,657,647.27. A true and correct copy of the Secured Promissory Note is attached hereto as **Exhibit 1**.

29.     The Note contains an arbitration clause requiring disputes between the parties to be submitted to binding arbitration. Secured Promissory Note, pg. 4. *Patrick is not a party to the Note and did not sign the Note in any capacity.*

30.     On or about June 21, 2022, Hunter Mountain, Dugaboy, and others entered into a Confidential Settlement Agreement and Release (the "Settlement Agreement"). The Settlement Agreement is confidential and so is not attached.[6] The Charitable DAF had no interest in Hunter Mountain at the time the parties executed the Settlement Agreement.

31.     The Settlement Agreement also contains an arbitration clause for disputes arising from the agreement. Settlement Agreement, § 6.2. *Patrick is not listed as a party and did not sign the Settlement Agreement in any capacity. Id.* pg. 9.[7]

32.     On March 24, 2025—*after* the Charitable DAF filed actions to collect on significant debts owed by Dondero entities—Dondero, through Dugaboy, retaliated by filing an arbitration proceeding with the American Arbitration Association, AAA Case No.: 01-25-0001-5229, *The Dugaboy Investment Trust v. Hunter Mountain Investment Trust, Mark Patrick, and Rand PE Fund I, L.P.,* (the "Arbitration"). Dondero, through Dugaboy, alleges fraud and breach of fiduciary duty claims against Patrick individually. Dugaboy later filed a Statement of Claims, a true and correct copy of which is attached hereto as **Exhibit 2**. To repeat: Patrick did not sign either of the at-issue agreements which contain arbitration clauses and that form the basis for the Arbitration.

---

6 Plaintiff shall promptly move for a protective order to allow timely disclosure of the Settlement Agreement to the Court.

7 The arbitration provisions in the Note and Settlement Agreement are collectively referred to as the "Arbitration Agreements."

<u>CAUSE OF ACTION – DECLARATORY JUDGMENT</u>

33.    Patrick seeks a declaration that he is not bound by the Arbitration

Agreements because: (1) he did not sign either in any capacity; and (2) under Texas

law, non-signatories to an arbitration agreement are not bound absent a recognized

exception, none of which are applicable here.

**A.    Whether the Arbitration Agreements bind Patrick is a question for this Court, not the arbitrators, to decide.**

34.    Whether an arbitration agreement exists—and whether it binds a non-

signatory—are "gateway" issues reserved for the court. *See Jody James Farms, JV v.*

*Altman Grp., Inc.*, 547 S.W.3d 624, 631–32 (Tex. 2018); *In re Weekley Homes, L.P.*,

180 S.W.3d 127, 130 (Tex. 2005). Arbitration is a matter of contract, meaning parties

cannot be compelled to arbitrate any controversy without having contractually agreed

to do so. *TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico, LLC*, 667 S.W.3d 694,

701 (Tex. 2023). Thus, where an arbitration agreement is silent, as it necessarily is

with respect to non-signatories, it cannot mandate arbitration. *See Jody James*

*Farms*, 547 S.W.3d at 632. Furthermore, mere incorporation of the American

Arbitration Association (AAA) rules does not show a clear intent to arbitrate

arbitrability as regards non-signatories. *Id.*

35.    At issue are the Arbitration Agreements contained in the Note and the

Settlement Agreement. While the Arbitration Agreements incorporate the AAA rules,

neither addresses non-signatories. Secured Promissory Note, pg. 4; Settlement

Agreement, § 6.2. Texas law is clear that where a contract is silent on a matter, it

"cannot speak to that matter with unmistakable clarity, so an agreement silent about

arbitrating claims against non-signatories does not unmistakably mandate arbitration of arbitrability in such cases." *Jody James Farms*, 547 S.W.3d at 632. Accordingly, the question of whether Patrick, as a non-signatory, is bound by the Arbitration Agreements is a gateway issue for the Court to decide, not the arbitrator.

**B.    The Arbitration Agreements do not bind Patrick.**

36.    Texas courts recognize six limited legal theories under which a non-signatory may be bound by an arbitration agreement under the FAA: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel; and (6) third-party beneficiary. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005); *see also Jody James Farms*, 547 S.W.3d at 633.

37.    The party seeking to compel arbitration bears the burden to establish both the existence of a valid arbitration agreement binding the parties and that the scope of that agreement encompasses the dispute. *TotalEnergies E&P USA*, 667 S.W.3d at 720 (quoting *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018)). Whether a non-signatory can be bound by an arbitration agreement is a matter of "validity." *See In re Weekley Homes,* 180 S.W.3d at 130*; see also CPG 220 Holdings 2014, LLC v. Mulcahy*, 709 S.W.3d 728, 734 (Tex. App.–Austin 2025, pet. filed) (citing *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 524 (Tex. 2015)).

38.    Patrick is not a signatory to the Arbitration Agreements, and none of the six recognized theories for binding a non-signatory apply to Patrick. Furthermore, Dugaboy has the burden of establishing the existence of a valid arbitration agreement binding Patrick and yet has not asserted any of the identified six legal theories in the underlying Arbitration. *See* Dugaboy's Statement of Claims.

Accordingly, this Court should enter a declaratory judgment declaring that Patrick is not bound by the Arbitration Agreements.

**PRAYER**

Patrick respectfully requests that the Court:

a)    Enter a declaratory judgment in Patrick's favor, declaring that Patrick is not bound by the Arbitration Agreements and is not required to arbitrate the claims asserted against him in the underlying arbitration proceeding, as set forth above;

b)    Absent an agreement, issue a preliminary injunction enjoining Dugaboy from pursuing or continuing to pursue arbitration against Patrick with respect to the claims at issue, pending final resolution of this action;

c)    Award Patrick his costs and reasonable attorneys' fees as permitted by law; and

d)    Such other and further relief as this Court finds proper, just, and equitable.

Respectfully submitted,


By:  /s/ *Brian P. Shaw*
    **Brian P. Shaw**
     Texas Bar No. 24053473
      Email:  bshaw@ccsb.com
    **Joshua D. Kipp**
     Texas Bar No. 24078793
      Email:  jkipp@ccsb.com
    **Andrea C. Reed**
     Texas Bar No. 24121791
      Email:  areed@ccsb.com
    **Carrington, Coleman,**
     **Sloman & Blumenthal, L.L.P.**
    901 Main Street, Suite 5500
    Dallas, Texas 75202
    (214) 855-3000 – Telephone
    (214) 580-2641 – Facsimile
    **ATTORNEYS FOR PLAINTIFF**

ORIGINAL COMPLAINT FOR DECLARATORY RELIEF — Page 13